## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TAMMY BURDETTE,**

      **Plaintiff,**

**v.**                              **CIVIL ACTION NO. 2:07CV84**

**ADVANCED TELEMARKETERS CORP.,**
**d/b/a Aegis,**

      **Defendant.**

### ORDER/OPINION DECIDING MOTIONS FOR SUMMARY JUDGMENT

### I.
### Procedural History

Plaintiff, Tammy Burdette [hereinafter sometimes referred to as "Burdette" or "Plaintiff"], filed her civil complaint against Defendant, Advanced Telemarketing Corporation, dba Aegis Communications Group [hereinafter sometimes referred to as "Aegis" or "Defendant"], in the Circuit Court of Randolph County, West Virginia on September 20, 2007 seeking compensatory and punitive damages on claims that Aegis discriminated against her in employment in violation of 42 U.S.C. §12101, et seq.

Aegis removed the action to this Court on October 19, 2009. By answer bearing the same date, Aegis generally denied the allegations in the complaint and asserted affirmative defenses of "statute of limitation, or any and all affirmative defenses, which may be disclosed from discovery or evidence herein, as set forth in Rule 8( c ) of the Federal Rules of Civil Procedure" [Third Defense] and "any and all affirmative defenses to which it is entitled under the provisions of any applicable provisions of Title VII of the United States Civil Rights Act of 1964; the West Virginia Human Rights Act; or other applicable statutes, rules, or regulations" [Seventh Defense]. (DE 2).

By Notices of Consent To The Exercise Of Jurisdiction By A United States Magistrate Judge filed by Aegis and by Burdette on August 13, 2008 (DE 19 and 20), the Senior United States District Judge Robert E. Maxwell referred the case to the undersigned Magistrate Judge "to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. §636, and Fed. R. Civ. P. 73."

Discovery having ended on June 30, 2009 in accord with the Amended Scheduling Order dated March 20, 2009 (DE 29), the matter is now pending before the Court on Defendant's Motion For Summary Judgment filed September 15, 2009 (DE 44-45); Defendant's Second Motion For Summary Judgment With Respect To Plaintiff's Failure To Exhaust Administrative Remedies filed October 19, 2009 (DE 67-68); and Plaintiff's Responses thereto (DE 50, DE 69, DE 70 and DE 76).

## II.
## Statement of Facts

Overview

Aegis is a company that operates call centers providing telephone answering services to its clients and customers, one of which is and was Western Union, at locations in the Northern District of West Virginia. Burdette was employed on two separate occasions between 2001 and 2005 at Aegis' Elkins call center to answer phone inquiries of Western Union Customers. Burdette quit her employment with Aegis before she could be fired in 2003. Several months later, Burdette again applied for employment with Aegis. She was again hired and worked part time until her termination on September 20, 2005. Burdette was diagnosed with interstitial cystitis and irritable bowel

syndrome after she was discharged from her second term of employment with Aegis.   It is within this context that the following facts from the record are relevant.

Facts From The Record:

Burdette, at age 27,  filed an application for employment with Aegis on March 1, 2001 in which she noted that she was not "Handicap[ped]."  DE44-1 (Exhibit 1).  During Burdette's first employment with Aegis Plaintiff was absent from work, late for work, or otherwise off station at work  resulting in her supervisor, Kelley Brady, recommending she be terminated.

Dr. Kahn noted on January 3, 2002 and again February 28, 2002 that Burdette needed "free access to bathroom breaks."  DE 49 (Exhibit 2).  On August 30, 2002 Burdette's doctor made Aegis aware that Burdette: "may need to miss work occasionally"; "may have palpitations and lies down & rests and feels better"; and "Toprol occasionally makes patient feel tired.  Pt. needs to go to bathroom occasionally due to fluid pill."  DE 49 (Exhibit 2)

Prior to the company's exercise of it's right of termination, Burdette resigned on March 14, 2003.  DE 44-1 (Exhibit 2).  However, Burdette avers "she was terminated for too many days missed, as Aegis quit taking any doctor's excuses." DE 49 (Plaintiff's Affidavit In Opposition To Summary Judgment Motion-Averment #3).

Burdette at age 30  filed another application for employment with Aegis on February 3, 2004. She again noted she was not "Handicap[ped]."  DE44-1 and DE 44-1 (Exhibit 3 p. 40).  She testified she did not mark herself as "handicapped" because:  "It was a medical condition.  I didn't know at the time it was a disability."  DE 44-1 (Exhibit 3, p. 39). Incident to that application, on February 17, 2004 Burdette signed the "Acknowledgement [sic] of Receipt of Aegis Communications Group, Inc.

3

Associate Handbook" and agreed to a 90 day associate orientation and training period. She recognized that completion of the training period did not guarantee continued employment with Aegis, particularly if she failed "to comply with the Company's policies and rules." A copy of the rules was supplied to her on employment. DE 44-1 (Exhibit 4)and (Exhibit 5).

Burdette received a May 5, 2004 written warning for "no call no show" on May 2, 2004. DE 44-1 (Exhibit 4). This Associate Corrective Action was for Burdette's not calling in advance of her not showing up for work on May 2, 2004 in violation of policy.

On May 14, 2004 Supervisor Collette issued a memo that she had talked to Burdette on that date about excessive breaks affecting her schedule adherence. DE 44-1 (Exhibit 4).

Burdette acknowledged she was warned in writing for June 11 and 19, 2004 incidents of being late four hours for her scheduled shift without notification to her employer prior to the time the shift was to start. DE 44-1 (Exhibit 4).

Burdette acknowledged she was warned in writing for a July 16, 2004 incident of being absent from her scheduled shift. This constituted her ninth such unscheduled absence. DE 44-1 (Exhibit 4).

By memorandum dated August 1, 2004, received by Burdette on August 20, 2004, Aegis announced that, effective August 2, 2004, "tardiness, late from break and/or leave earlies" [sic] would count against an employees schedule adherence. All employees were to maintain 85% schedule adherence. The memorandum further announced the first low schedule adherence would result in a written warning; the second with another written warning, and the third with termination.

Burdette received a written warning for rude and argumentative behavior to a customer on August 20, 2004 in violation of Aegis policy (Handbook pg. 22, #3). (DE 44-1 Exhibit 4).

On September 15, 2004 Burdette was given the following written warning: "Unscheduled Absences: On Thursday, September 9, 2004, Tammy called off from her shift due to her doctor's orders. Tammy was off from September 9 through September 12. Due to Tammy's medical situation, she has been given one unscheduled absence for all four days she missed. This results in Tammy's 9th UA and, per Aegis policy, warrants a written warning." DE 44-1 (Exhibit 4).

By written warning dated October 20, 2004, Burdette was warned for "Schedule Adherence: For the first half of October, 2004, Tammy has an overall schedule adherence average of 79%. The goal for adherence is 92%. Tammy's adherence has been adversely affected by her excessive breaks, which total approximately 45 minutes per day. ... This will serve as Tammy's second final written warning." DE 44-1 (Exhibit 4).

A written warning for her ninth unscheduled absence on Friday, October 22, 2004 was issued October 27, 2004. DE 44-1 (Exhibit 4).

A written warning for her tenth unscheduled absence on Sunday, October 24, 2004 was issued October 27, 2004. Burdette was warned if she accumulated one more unscheduled absence, she may be terminated. DE 44-1 (Exhibit 4).

By memorandum dated November 30, 2004 Burdette and other Aegis associates were notified if they called off on a holiday, they would receive two unscheduled absences on their record. Burdette acknowledged receipt of the memorandum on December 6, 2004.

A written warning for her ninth unscheduled absence on November 29, 2004 was issued to Burdette on December 10, 2004.  DE 44-1 (Exhibit 4).

By written warning dated December 20, 2004, Burdette was warned for "Schedule Adherence:  For the first two weeks of December, 2004, Tammy had  an overall schedule adherence average of 80%.  The goal for adherence is 92%.  Tammy's low adherence is due mainly to her arriving late for her scheduled shift."  DE 44-1 (Exhibit 4).

A written warning for her 10th  unscheduled absence on December 14, 2004 was issued to Burdette on December 17, 2004.   Burdette was told that this was her final warning.  DE 44-1 (Exhibit 4).

By written warning dated May 19, 2005, Burdette was warned for "Schedule Adherence:  For the first two weeks of May 2005, Tammy has  an overall schedule adherence average of 83%.  The adherence goal for the call center  is 92%.  Tammy's low adherence is due to her being tardy and taking excessive breaks."  DE 44-1 (Exhibit 4).

"Call Offs and Leave Earlies" [sic] on pay day weekends became a problem for Aegis in early 2005 resulting in a memorandum dated May 24, 2005, received by Burdette on May 27, 2005, threatening that if work attendance on pay day weekends did not improve, the policy in effect would change and anyone calling off on a pay day weekend would receive two days of unscheduled absences.  DE 44-1  (Exhibit 4).

On July 7, 2005 Lisa White of Aegis noted to Burdette's file that:  "Tammy is receiving a note to file for her schedule adherence for 6/15 - 6/30/05.  Tammy's average was 83%.  Due to her medical issues over the past few weeks, she will not be receiving formal disciplinary action.

However, Tammy is fully aware that if her schedule adherence is not at an 86% or higher for the 7/1 - 7/15/05 period, she may be terminated." DE 44-1 (Exhibit 4).

Aegis warned Burdette that her unscheduled absence on August 4, 2005 resulted in her being charged with an unscheduled absence and given a first written warning for this, her 9th UA. DE 44-1 (Exhibit 4).

On August 16, 2005 Aegis' Angie Scott provided all Aegis associates with a "Leave Early Policy Change Memorandum." DE 44-1 Exhibit 4. The memorandum indicated Scott had sent memorandums to the floor several times complaining about early leaving from work or working part shifts, the burden that placed on others who remained working, the resulting abandonment of calls and the displeasure shown by the client, Western Union, over this lack of attentiveness to its business. Based on the lack of voluntary compliance with the prior memorandums requests, Aegis changed its policy effective August 19, 2005. Under the new policy, if an employee did not complete his or her shift, the employee would receive an "unscheduled absence" and one leave early per month would be excused for emergencies with proper documentation. On August 18, 2005 Burdette acknowledged she had received, read and understood the policy change memorandum. DE 44-1 (Exhibit 4).

Aegis warned Burdette in writing that her call off from her regular shift on Sunday September 11, 2005 resulted in her having an unscheduled absence, her 4th in a 3 month period of time. DE 44-1 (Exhibit 4).

Burdette was warned in writing that, for the first two weeks of September, 2005, she had low schedule adherence of 79% (the goal was 92%) due to "her taking excessive unauthorized breaks as

well as exceeding the time alotted [sic] for her scheduled breaks." She was warned she had received a final written warning on May 24, 2005; had since received 2 documented coachings [sic] on 6/17 and 7/7; and "[a]t this time immediate termination is warranted." DE 44-1 (Exhibit 4).

Plaintiff was aware of the Aegis attendance policies. She was aware of the switch from the excused absence policy (Aegis would accept doctor's excuses) to the no-fault absence policy (doctor's excuses were no longer necessary). She was also aware that Western Union was Aegis' major, if not only client; of Western Union's concern that Aegis was not meeting its performance goals; and that the loss of Western Union's business would be a major loss of income for Aegis and cause a major loss of jobs. DE 44-1 (Exhibit 3, p. 98-99, 36-38).

Notwithstanding the complications her weight of approximately 200+ pounds and her pregnancy put on her body, Burdette testified her mitral valve prolapse caused her to have difficulty walking into work from the parking lot and staying awake while at work for Aegis. DE 44-1 (Exhibit 3, p. 99-103). At the time of her continued deposition (July 28, 2009) Burdette weighed more than 250 pounds and was 5'10" tall. DE 44-1 (Exhibit 3, p. 43, line 15-20).

Plaintiff asked to work in the back row of computers which was very close to the bathroom but was not so permitted. DE 49 (Plaintiff's Affidavit In Opposition To Summary Judgment Motion- Averment #34). Plaintiff admitted there was no assigned seating and that she tried to sit on the side of the rows of computers closest to and within a minute walking distance to the restrooms while working at Aeigis. She admitted she had a fifteen minute break during the day that she could split in to a seven minute and an eight minute break. She admitted she was only working four hours a day and still did not comply with the attendance policy. She admitted she missed work to take her

husband to see a lawyer; to visit her husband in jail; do things with and for her children; and, that those chosen absences reduced the number of days she could miss because of illness under the no-fault absence policy. DE 44-1 (Exhibit 3, p. 36-38).

Plaintiff averred she "asked to work at the front desk as an accommodation ... as the front desk was within closed [sic] proximity to a private bathroom that would have required less time getting back and forth to her work site and would have been less stressful work...." DE 49 (Plaintiff's Affidavit In Opposition To Summary Judgment Motion-Averment #33). However, she could not recall that position ever being advertised or whether Aegis had a policy of not permitting an employee who had any disciplinary action to apply for another position. DE 44-1 (Exhibit 3, p. 33).

Lisa White, Burdette's supervisor at Aegis, testified: she knew Burdette was taking blood pressure medication that made her urinate more frequently which would not cause problems with work performance but would cause a problem with schedule adherence; she recalled talking to Burdette about going to the bathroom more than once per day; that Burdette's termination was very easy and that it was for excessive breaks. DE 48.

Burdette was terminated from her employment with Aegis on September 20, 2005.

Burdette started working for RESCARE taking care of two mentally retarded and developmentally delayed individuals 40 hours per week in a private home in October 2005. DE 44-1 (Exhibit 3, p. 47, line 8; p. 48, line 1).

Approximately a year after her termination from Aegis, Plaintiff was diagnosed by Dr. Chua with interstitial cystitis on September 11, 2006. after she left Aegis. DE 44-1 (Exhibit 3, p. 24, line

14-16, p. 27, line 18-21, p. 100-102) and DE 49 (Plaintiff's Affidavit In Opposition To Summary Judgment Motion-Averment #9).

Plaintiff was diagnosed with irritable bowel syndrome after she left Aegis. DE 44-1 (Exhibit 3, p. 73, line 16-18, p 79, line 6-9). She averred she had "erratic bouts of explosive diarrhea, with memories of walking home from a pizza party at age 17 and not making it, but it was not until her third pregnancy it became a frequent problem." DE 49 (Plaintiff's Affidavit In Opposition To Summary Judgment Motion-Averment #11).

Plaintiff averred "[s]he was not able to comply with the adherence policy of Aegis because of too many bathroom breaks for her pregnancy complications, interstitial cystitis, and irritable bowel syndrome and her exhaustion from her hypertension, ankle edema, EKG abnormalities, alopecia, palpitations, and / or obesity." DE 49 (Plaintiff's Affidavit In Opposition To Summary Judgment Motion-Averment #23-32).

Plaintiff was still able to go to nursing school three days per week and care for her three children (ages 10, 7 and 3 as of the October 31, 2008 deposition). DE 44-1 (Exhibit 3, p. 73-75). Plaintiff did not keep of record of absences from RESCARE caused by her irritable bowel syndrome; stated her IBS was controlled by medication; and that she had not been disciplined by RESCARE since starting employment there. DE 44-1 (Exhibit 3, p. 76-80).

With respect to Plaintiff's claim that she is "a disabled person within the meaning of the American with Disabilities Act because she has physical impairments that substantially limit one or more of her major life activities including working" Plaintiff testified those impairments were IBS, interstitial cystitis, her knees, twisted spine and mitral valve prolapse. DE 44-1 (Exhibit 3, p. 80-81).

Notwithstanding her IBS, Plaintiff testified she was able to go to school full time, care for her children, take care of her home, drive, prepare food, study for her courses, perform her work at RESCARE, visit her husband in jail, and go to church in Clarksburg some 45 minutes from her home in Belington. DE 44-1 (Exhibit 3, p. 82-84) and (Exhibit 7). The work duty she was able to perform at RESCARE was teaching retarded and developmentally delayed persons "basic living skills"- "normal things that you would do in your own home" such as: "dishes, laundry, sweeping, mopping, bathing, grocery shopping, eating out, vacuuming, making a bed, cleaning the sink, commode, washing mirrors in the bathroom." DE 44-1 (Exhibit 3, p. 83-95). Plaintiff admitted she never has had and has never applied for a "handicapped parking pass." She taught by demonstration. DE 44-1 (Exhibit 3, p.41).

After Plaintiff left Aegis and was diagnosed with interstitial cystitis, she only recalled calling off one time for it and was able to do her job even with the condition. DE 44-1 (Exhibit 3, p. 96, line 1-15). Plaintiff testified she was able to do her job with RESCARE even with her knee problems, her twisted spine, her mitral valve prolapse and even though she did have some problem going up steps and the valve problem made her tired. DE 44-1 (Exhibit 3, p. 96-97). None of her problems interfered with her full time nurses education at Davis and Elkins College except that the heart valve problem caused her to miss one class. DE 44-1 (Exhibit 3, p. 97-98).

In response to the question: What major life activity are you alleging that you're unable to do because of any of these limitations Plaintiff testified: "At any time in my life, my life can be just disturbed. I can stop plans, I don't go places because it just - - at times it affects me more than what it does others." DE 44-1 (Exhibit 3, p. 99).

Approximately a week prior to Burdette's continued deposition of June 11, 2009, she became employed as part of her nurse's education program in an optional part-time position at United Hospital Center.  DE 44-1 (Exhibit 3, p. 30-32).

### III.
### Discussion

A.    Summary Judgment

From the text of Rule 56(c) of the Federal Rules of Civil Procedure, it is clear that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Motions for summary judgment impose a difficult standard on the moving party; for, it must be obvious that no rational trier of fact could find for the nonmoving party.  Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990).

"When a motion for summary judgment is made . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987).  Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather than encourage mere speculation.  <u>Anderson</u>, 477 U.S. at 248.

It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).

Summary judgment is not appropriate until after the nonmoving party has had sufficient opportunity for discovery.  <u>See</u> <u>Oksanen v. Page Memorial Hosp.</u>, 912 F.2d 73, 78 (4th Cir.1990), <u>superseded on rehearing</u>, 945 F.2d 696 (4th Cir.1991).

B.     <u>Disability Under ADA</u>

"To establish a prima facie case under the ADA, Burdette must show:  (1) she has a disability; (2) she is a qualified individual; and (3) she was discriminated against because of the disability."  <u>Swain v. Hillsborough County School Board</u>, 146 F.3d 855, 857 (11th Cir. 1998)(internal citations omitted).  The Eighth Circuit holds:  "To establish a prima facie case of discrimination under the ADA, an employee must show that he or she:  (1) has a disability within the meaning of the ADA;  (2) is qualified to perform the essential functions of his or her job, with or without reasonable accommodation; and (3) suffered an adverse employment action because of the disability.  <u>Maziarka v. Mills Fleet Farm, Inc.</u>, 245 F.3d 675 (2001).  The Fourth Circuit holds: "a plaintiff establishes a prima facie case if he demonstrates that (1) he is within the ADA's protected class;  (2) he was discharged;  (3) at the time of his discharge, he was performing the job at a level

that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." <u>Haulbrook v. Michelin North America, Incorporated,</u> 252 F.3d 696 (2001).

1. Substantially Limited In The Life Activity Of Working

"The ADA defines disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or ( C ) being regarded as having such an impairment." <u>Swain v. Hillsborough County School Board,</u> *supra* at 857[1].

Under 29 C.F.R. § 1630.2(j)(1)(i)-(ii) an impairment is "substantially limiting if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an

---

[1]

<u>Swain</u> is factually similar to the case at bar. Swain brought action against the school board alleging discrimination due to incontinence in violation of the Americans With Disabilities Act of 1990. She suffered from a combination of ailments (incontinence encountered post child birth, bladder leakage when coughing, laughing or sneezing, high blood pressure, took a diuretic which increased her need to urinate and an abnormal creatinine level requiring her to consume fluids regularly). Students in the GED class presented the school with tardiness problems during changes of classes resulting in a change of policy. Under the changed policy GED students were not permitted to change class. Swain complained the new policy was demeaning to the students and herself and that she did not have adequate opportunity to use the restroom. She did not initially advise the school administration of her specific problems. Once she did so advise them, pursuant to their suggestion, she found two teachers who were willing to relieve her for brief periods during their afternoon conference periods so she could go to the restroom. After her retirement, citing a deterioration in her relationship with the school administration, Swain filed suit. In her affidavit in opposition to summary judgment she stated that her physical impairments were the primary reason for her retirement. On appeal from a Magistrate Judge's grant of summary judgment to the School Board, the Court of Appeals held Swain's incontinence did not constitute a disability under the ADA.

individual can perform such an activity compared to the general population.". Maziarka v. Mills Fleet Farm, Inc., *supra* at 679.  According to the 8th Circuit, "[s]everal factors are considered in determining whether a person is substantially limited in a major life activity:  (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact. 29 C.F.R. §1630.2(j)(2)(i) - (iii).  To be substantially limited in the life activity of working, a plaintiff must be 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' 29 C.F.R. §a630.2(j)(3)(i).  Inability to perform one particular job does not constitute a substantial limitation on working.  *Id.*  A plaintiff must show that because of his impairment he has suffered a significant reduction in meaningful employment opportunities.  Webb v. Garlick Mfg. Co., 94 F.3d 484, 488 (8th Cir. 1996)."  Maziarka v. Mills Fleet Farm, Inc., *supra* at 679.  The "ADA simply was not designed to protect the public from all adverse effects of ill-health and misfortune ....  Extending the statutory protections available under the ADA to individuals with broken bones, sprained joints, sore muscles, infectious diseases, or other ailments that temporarily limit an individual's ability to work would trivialize this lofty objective."  Halperin v. Abaccus Tech., Corp., 128 F.3d 191 (4th Cir. 1997).

Burdette asserts that her physical ailments are permanent conditions that substantially limit a major life activity, to wit: working.  Therefore, in order for her to establish a prima facie case that survives summary judgment, she "must present sufficient evidence to create a genuine issue of material fact as to whether her physical impairments substantially limit her ability to work." *Id.*

While Burdette does show that her conditions affect her ability to perform one particular job (Aegis) because of the particular requirements of that job, there is no evidence showing that her conditions make her unable to perform the functions of other jobs. As in <u>Swain</u>, *supra*, Burdette "has presented no evidence to show that she cannot perform a broad range or class of jobs; instead, she simply makes the vague assertion that she is unable to perform any job that precludes her from having regular access to a restroom." Burdette, like Swain, argues "that she has a disability under the ADA because she has a physical impairment which precludes her from working in any job that a person with her impairment cannot perform.Were the Court to accept this tautological reasoning, no physical or mental impairment would fall outside the scope of the ADA." <u>Swain</u>, *supra* at 858. To the contrary, the only evidence in the record supports the conclusion that Burdette was able to perform the functions of other jobs. Her evidence, taken in the light most favorable to her, establishes she is able to perform and has successfully performed the functions of going to nursing school; of working full time for RESCARE; and of working as a trainee at UHC, all since being terminated at Aegis on September 20, 2005. While working for RESCARE, attending school, and / or working as a trainee at UHC, Burdette also performed the normal duties of caring for her three children and her home (her husband was in jail and could not assist with these duties).

Accordingly, Burdette is not disabled within the meaning of the ADA.

2. Essential Functions Of Job

"To be a 'qualified individual' within the meaning of the ADA, [Burdette] must (1) possess the requisite skill, education, experience, and training for [her] position; and (2) be able to perform the essential job functions, with or without reasonable accommodation." <u>Maziarka v. Mills Fleet</u>

Farm, Inc., *supra* at 680 citing <u>Moritz v. Frontier Airlines, Inc.</u>, 147 F.3d 784, 786-787 (8th Cir. 1998). The Fourth Circuit says the same thing in a slightly different way: she mus show "[s]he was performing the job at a level that met [her] employer's legitimate expectations." <u>Haulbrook v. Michelin North America, Incorporated</u>, *supra* at 696.

"It is well settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform." <u>Maziarka v. Mills Fleet Farm, Inc.</u>, *supra* at 682 citing <u>Moritz v. Frontier Airlines, Inc.</u>, 147 F.3d 788.

Burdette fails to present any triable issue of fact as to whether she could perform the functions of her job at Aegis with reasonable accommodation.

Burdette was aware that dependable attendance was an essential part of her job. DE 44-1 (Exhibit 3 p. 97-99). On February 17, 2004 Burdette signed an Aegis form certifying she had received a copy of the Aegis Communications Group, Inc. Handbook and understood that failure to comply with the Company's policies and rules may result in disciplinary action up to and including termination. DE 44-1 (Exhibit 4). DE 44-1 Exhibit 5 is the Associate Handbook. The attendance policy is clearly set forth on pages 6 and 7. In the first paragraph, it states: "We will expect you to maintain satisfactory attendance and report to work on time every day. You must keep unscheduled absences, late arrivals and early departures to a minimum as they place an undue burden on your co-workers and hurt our ability to provide service to our clients." It further states: "<u>Schedule Adherence</u> violations affect performance, therefore they are dealt with under the Conduct and Discipline policy. However, for the purpose of defining schedule adherence as it relates to perfect attendance, tardiness occurs when you have not clocked in at your designated starting time or when

your return late from break or lunch...."  DE 44-1 (Exhibit 5).  By Memorandum dated August 1, 2004, Aegis notified all of its associates that "[e]ffective August 2nd, tardiness, late from break and /or leave earlies [sic] will count against your schedule adherence" citing that "[s]chedule adherence is very important.  At this time, due to the abuse of schedule adherence, we have to keep 30-40 more CSRs than we truly need.  This costs the company a lot of money."  It emphasized:  "When you are late to work, take excessive breaks, take breaks or lunches longer than scheduled, or leave early from your scheduled shift, you dump your workload onto your co-workers. ... Our client Western Union relies on us to give their customers great customer service.  If we abandon calls because too many people are off the phones due to these reasons we are not giving our best to the customers, Aegis, or Western Union."  DE 44-1 (Exhibit 4).  By Memorandum dated August 16, 2005, acknowledged by Burdette as having been received and read on August 18, 2005, Aegis, because of the continued increase in the amount of leaving early that resulted in abandonment of Western Union's customers' calls and its displeasure with the level of service it was receiving, changed its Leave Early Policy to permit one Leave Early per month.  DE 44-1 (Exhibit 4).   On September 1, 2005 Burdette acknowledged that she had received and read the Elkins Attendance Policy.  DE 44-1 (Exhibit 4).  That Leave Early Policy Change stressed Aegis' concern with attendance and its impact on service to its customer, Western Union and the impact on fellow employees.  DE 44-1 (Exhibit 4).

Burdette admitted she was aware of the attendance policies and the switch from the excused absence policy that would accept doctor's excuses to the no-fault absence policy where doctor's excuses were no longer necessary.  She was also aware that Western Union was Aegis' major, if not only client; of Western Union's concern that Aegis was not meeting its performance goals; and that

the loss of Western Union's business would be a major loss of income for Aegis and cause a major loss of jobs. DE 44-1 (Exhibit 3, p. 98-99, 36-38).

It is undisputed fact that in the 16 month period between May 5, 2004 and her termination on September 20, 2005, Aegis warned Burdette at least 15 times for attendance non-compliance and non-adherence to her required schedule. Moreover, Burdette failed to comply with the expected schedule adherence during her first term of employment resulting in her voluntarily resigning rather than face being fired.

With respect to IBS: Burdette states if she was "experiencing an episode of irritable bowel syndrome, I can't do anything because I'm usually in the restroom"; IBS was not a problem for her work at RESCARE because she was told she could go to the restroom any time she needed to; IBS was not a problem at school because she could get up in class and go to the restroom and there were plenty of them available; and she was unable to quantify how many times she was unable to do anything because of IBS because she did not keep a log or record. Burdette claims her life activities are limited by her IBS, interstitial cystitis, knees, spine and mitral valve prolapse because: "At any time in my life, my life can be just disturbed. I can stop plans. I don't go places because it just - - at time it affects me more than what it does others. The - - everything. Depending on what episode I'm having at the time. The worst that bothers me would have to be my bladder, irritable bowel syndrome and my heart."

With respect to mitral valve prolapse Burdette testified she was unable to stay awake at times; found it hard to walk into work during her employment with Aegis; and "[m]itral valve prolapse affects a whole lot of areas of your life, it's not just one thing. It's been linked to the

irritable bowel. It's been linked to exhaustion. It's been linked to - - I mean, there's just days when I feel like I can't get out of bed if it gets really bad. I cannot move. I mean, I don't have the energy to do anything. It causes palpations. I have chest pain."; "if you can't stay awake you can't answer a phone call."; If you're having chest pains, you can't answer a phone call. If you have to go to the bathroom, you can't answer a phone call. You can't take this with you, and so there's just no way to do these things." DE 44-1 (Exhibit 3, p. 99-103). These are admissions that Burdette simply could not perform the required functions of her employment with Aegis no matter what accommodation might be made.

Burdette's suggested accommodations were: 1) to place her at a station in close proximity to the bathrooms; 2) to change her from an associate answering the phones to a receptionist at the front desk; and / or 3) to repair stalls in the bathrooms. In this regard, it must be considered that Aegis had already granted Burdette's request to work part-time (four hours per day); had a policy of not assigning seating to its employees thus permitting Burdette to sit where there was space and choose to be as close to the restroom as available space would allow (except for the last row); permitted employees to split their 15 minute break into separate 7 and 8 minute breaks; fixed the bathroom stalls; and did not require 100 % schedule adherence thus providing some "fluff" time.

Since Burdette's self described flare ups of IBS, interstitial cystitis, and heart problems caused by her mitral valve prolapse were intermittent and unpredictable from the standpoint of when they would occur and how long they would last, even if she sat in the back row Burdette is unable to establish that she would be able to stay awake and stay on station to answer the required calls. The best proof of this inability was Burdette's response to the questions: "And you could have split

that [15 minute break] into two seven - - a seven - minute break and an eight - minute break" and "You chose not to do that?" Her response: "I think that I took more than two seven minute breaks[2], and so I really didn't choose not to do anything." shows that she could not perform the essential functions of her job (being on station answering the telephone) because she says she needs to be away from her station whenever she has a flare up and for as long as the flare up lasts from one or more of the conditions she has. This conclusion is further supported by Burdette's averments in her Affidavit In Opposition To Summary Judgment Motion. (DE 49 averments 10,11 12, 16, 23, 25, 26, 27-32). It is not reasonable to expect and the law does not require Aegis to permit Burdette to set her own schedule and abandon her calls at any time and for any duration thereby shifting the burden of her work to other employees who are able to stay on station and perform the essential functions of the job.

### 3. Suffered Adverse Employment Action Because Of The Disability

"The fact that an employer is aware of an employee's impairment, without more, 'is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action.'" Haulbrook v. Michelin North America, Incorporated, *supra* at 703 citing Kelley v. Drexel University, 94 F.3d 102, 109 (3rd Cir. 1996). Resolving all factual disputes in Burdette's favor and giving her the benefit of all reasonable inferences, the record demonstrates that Aegis did not know the extent of Burdette's conditions and therefor, those conditions could not have caused the adverse employment action.

---

[2]The record reflects Burdette was taking 45 minutes in breaks each 4 hour work day instead of the permitted 15 minutes in breaks for the same time period.

For purposes of this portion of the analysis, the Court assumes that Lisa White, the supervisor at Aegis who fired Burdette and other supervisory employees knew Burdette was leaving her station to use the restroom and was intermittently falling asleep at her station.

However, Aegis could not know that Burdette had interstitial cystitis or irritable bowel syndrome because neither of those conditions were diagnosed until some time after her employment was terminated.

Plaintiff's evidence (Certification of Health Care Provider 8/30/02) establishes only that Aegis had reason to believe in August of 2002 that Burdette's heart condition and medicine to treat it would cause her to "occasionally ... feel tired" or to go to the bathroom more than "occasionally due to her taking a fluid pill. Plaintiff's evidence (Certification of Health Care Provider 8/30/02) establishes only that Aegis had reason to believe in March 2003 that Burdette "may need to miss or leave work depending on how severe symptoms are. The symptoms may include blackout, headache, blurry vision and severe palpitations." (Certification of Health Care Provider 8/30/02&3//4/03). Plaintiff's evidence establishes only that Aegis had reason to believe in January and February 2002 that Burdette's then condition required her to have "free and easy access to restroom."

Even taking Burdette's evidence in a light most favorable to her, there is nothing to indicate that she or the supervisors at Aegis considered her disabled during any period of her employment. Burdette signed forms at the start of both employments with Aegis in which she denied she was disabled. Burdette accepted the opportunity of employment with Aegis in 2004 believing she could do the work. She requested and received part time work at Aegis because of her own knowledge of

the limiting effects of her conditions, particularly her pregnancy, but not because she believed she could not do the work.

Burdette was fired from Aegis because she did not adhere to the schedule and perform the functions of her job. There is not one shred of evidence that shows and there is no reasonable inference from the evidence that can be made to show that Aegis knew or thought Burdette was disabled and fired her because of it. *Id.*

Burdette argues the Court should apply the 2008 Congressional Amendment of the ADA. Burdette readily acknowledges that the Fourth Circuit Court of Appeals has not yet spoken on whether the amendment is retroactive and a number of other Circuits have dodged the issue. Burdette acknowledges that the Amendment itself does not speak to retroactivity. In the absence of precedent, this Court declines to retroactively apply the 2008-2009 Amendment to a case that arises out of facts occurring from 2002-2005.

C. Failure To Exhaust Administrative Remedies

It is undisputed by the parties that Burdette's employment with Defendant terminated not later than September 20, 2005. It is also undisputed that Plaintiff did not file an EEOC complaint or a corresponding complaint with the West Virginia Human Rights Commission and that she did not obtain a right to sue letter at anytime prior to or since the filing of the complaint in State Court.

Notwithstanding Plaintiff's admission that she did not file a complaint with either of the administrative agencies, she contends:

1) exhaustion of administrative remedies is not jurisdictional and

2) Defendant waited too long to raise the issue (waiver and equitable estoppel).

The ADA does not contain its own and separate procedural exhaustion requirement. Instead, it relies on the provisions incorporated in Title VII of the Civil Rights Act of 1964, to wit: "[t]he powers, remedies, and procedures set forth in section 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title [42] shall be the powers, remedies, and procedures this subchapter provides to the [Equal Employment Opportunity] Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment." 42 U.S.C.A. §12117(a).

1)      Jurisdictional Pre-requisite

Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982), holds: ". . . [T]hat filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes* involved a class action suit brought by female flight attendants alleging gender bias based on allegations that they were required by TWA to take time off post child birth whereas the male flight attendants who became fathers were not so required. Some of the female flight attendants filed EEOC complaints and some did not. The District Court ruled that filing an EEOC complaint was jurisdictional pre-requisite to filing action in federal court but failure to do so in this particular instance did not prevent the District Court suit from moving forward as to those who had not filed EEOC complaints because TWA had not changed its alleged discriminatory policies. The Court of Appeals agreed that filing an EEOC complaint was a jurisdictional pre-requisite but did not agree with the District Court's continuing tort concept and instead stayed the proceedings. Through

arbitration, the case settled. However, to settle the question of whether filing of the EEOC complaint was jurisdictional, the Supreme Court of the United States accepted the case. In reversing the Court of Appeals, the Supreme Court reasoned the legislative history, statutory construction, and the Court's prior decisions all indicated that filing an EEOC complaint and receipt of right to sue letter were not jurisdictional pre-requisites but instead were statutory requirements subject to waiver, estoppel and equitable tolling.

In Price v. Schwan's Home Services, Inc., 2006 WL897721 (W.D.Pa.)(unpublished), Price, a 58 year old three-year employee of Schwan's, was terminated and his position was filled by a less experienced person under the age of 40. Price filed a complaint alleging Title VII violations and violation of the ADEA. Price alleged he filed a Pennsylvania Human Rights Commission (PHRC) complaint but did not obtain a right to sue letter. Schwan's moved for dismissal pursuant to F.R.Civ.P. 12(b)(6) contending that Price did not get a right to sue letter; the Title VII claims were not made to the PHRC; and his Title VII and ADEA claims were not timely filed with either the EEOC or PHRC.

Granting Schwan's motion with respect to Price's Title VII claims, the District Court held: "Filing a timely complaint with the PHRC and/or the EEOC is a precondition to filing a complaint in federal court. 'The timely exhaustion of administrative remedies is a precondition to the maintenance of a federal employment discrimination civil lawsuit.'" (internal citations omitted).

In Hawkins v. Defense Logistics Agency of the Department of Defense, 99 F.3d 1149 (10th Cir. 1996)(unpublished),Hawkins was RIF'ed from his employment with Defense Logistics Agency. He claimed the RIF had a disparate impact on disabled employees such as himself. While

prosecuting his administrative claim for the alleged discrimination, Hawkins filed an injunctive proceeding in Federal Court seeking to ameliorate potential adverse personnel actions while his case wound through the administrative process. The District Court dismissed the injunction proceeding.

Affirming, the Court of Appeals held: "This circuit deems the exhaustion of administrative remedies to be a prerequisite to federal court jurisdiction - - whether invoked for legal or, as here, strictly equitable relief - - in statutory discrimination cases."

Responding in a footnote to Hawkins argument that <u>Zipes</u>, *supra*, held exhaustion was not a jurisdictional prerequisite, the Court noted: "<u>Zipes</u> held only that the timeliness requirement for administration charges is, like a statute of limitations, subject to such equitable exceptions as waiver, estoppel, and tolling. That holding does not undercut this Court's exhaustion rule - - adhered to before and after <u>Zipes</u> - - that the administrative process must still be pursued before jurisdiction in federal court can be invoked."

In <u>Capruso v. Hartford Financial Services Group, Inc</u>. 2003 WL 1872653 (S.D.N.Y.)(unpublished),Capruso filed her Title VII and corresponding state claims in state court alleging gender based discrimination without first filing and exhausting her state or federal administrative remedies (EEOC). Hartford removed the case to the federal court. After a year and a half of litigation, Hartford moved for summary judgment in part asserting Capruso had failed to file her Title VII claims with the EEOC prior to bringing the suit.

In granting summary judgment, the Court held: "The exhaustion of administrative remedies is an essential element of Title VII's statutory scheme, and the failure to file with the EEOC and receive a right-to-sue letter is a sufficient ground for dismissal of a plaintiff's Title VII claims."

In <u>Burton v. District of Columbia</u>, 835 A.2d 1076 (DCCA 2003), Burton brought action against the District of Columbia for constructive discharge from employment as a police officer. During the trial of the case, the District moved to dismiss for failure to exhaust administrative remedies provided by District of Columbia Government Comprehensive Merit Personnel Act (CMPA). The Court granted the same holding: ". . . [T]he exhaustion doctrine is well established and of long standing, both in CMPA cases and generally, that doctrine is simply a 'rule of judicial administration' rather than a jurisdictional requirement. . . . [T]he Supreme Court has made it clear that exhaustion is not a 'jurisdictional prerequisite' to a court proceeding, but merely a requirement 'analogous to a statute of limitations' which is subject to waiver, estoppel, or other mitigating factors." (internal citations omitted).

In <u>Brown v. General Electric Company</u>, 1995 WL 340748 (N.D.N.Y.)(unpublished), Brown sued General Electric Company claiming age discrimination and a Title VII violation as a result of her having been selected for layoff when others, younger and older, were kept on the payroll. Brown did not obtain a right to sue letter.

In dismissing Brown's claims, the Court held: "[I]n order to bring an action under Title VII, a Plaintiff must first obtain a right to sue letter. With respect to whether a right to sue letter was a jurisdictional prerequisite under <u>Zipes</u>, *supra*, the Court stated: "Whether treated as a matter of jurisdiction or as a statutory condition precedent; however, plaintiff's unexplained failure to obtain a right to sue letter requires dismissal without prejudice."

Whether a jurisdictional pre-requisite, a condition precedent, a requirement analogous to a statute of limitations, a rule of judicial administration, or pre-condition to filing, it is well established

that plaintiff must first exhaust her administrative remedies and obtain a right to sue letter prior to instituting a Title VII action. Failure to do so may result in dismissal of the action unless there is some equitable reason not to do so.

In the instant case, it is undisputed that Burdette did not file a claim of disability discrimination with either EEOC or any other entity and she did not obtain a right to sue letter prior to filing the within suit in State Court. Burdette's admitted last day of work constitutes the last day of discrimination. Notwithstanding the merits of Burdette's claims, absent some judicially recognized equitable reason for not exhausting her administrative remedies or a waiver of exhaustion by Defendant, her pending disability discrimination claims are now subject to dismissal.

2)      Waiver

Capruso, *supra*, afforded the District Court the opportunity to address the question of whether removal of the claim to federal court and, thereafter, litigating for more than a year before moving for summary judgment was sufficient to constitute Defendant's waiver of Plaintiff's obligation to exhaust. The Court held: "Hartford raised the issue of exhaustion of administrative remedies in both its answer and its motion for summary judgment. Under these circumstances it cannot be said that a waiver occurred."

The D.C. Court of Appeals addressing Burton's challenge to the right of the court to entertain the District's motion once the final pretrial order had been entered without reference to the exhaustion of remedies defense noted: "In the case at bar, however, appellant was on notice that the exhaustion issue could arise at trial when the District raised it as a defense in its answer." Finding that the District had included the defense in its answer, the Court found that Burton could not be

prejudiced by the fact that the District did not assert the issue again until trial. Burton v. District of Columbia, *supra.*

These cases are not authoritative precedent. However, as in Capruso and Burton, Aegis timely filed its answer asserting: "statute of limitation, or any and all affirmative defenses, which may be disclosed from discovery or evidence herein, as set forth in Rule 8( c ) of the Federal Rules of Civil Procedure" [Third Defense] and "any and all affirmative defenses to which it is entitled under the provisions of any applicable provisions of Title VII of the United States Civil Rights Act of 1964; the West Virginia Human Rights Act; or other applicable statutes, rules, or regulations" [Seventh Defense]. (DE 2). This was actual notice of Defendant's intent to take advantage of any failure by Plaintiff to exhaust her administrative remedies. Plaintiff pursued her state action removed to federal court at her peril. By the time Plaintiff filed this action in state court on the last day of the state two year statute of limitations (September 20, 2007), two full years had expired since Plaintiff's September 20, 2005 employment discharge. The time for filing an EEOC complaint had long expired. Nothing Aegis did prevented Burdette from filing her EEOC or state agency claim.

3)    Estoppel

Burton v. District of Columbia, *supra* at 1080, citing a long line of cases, held that failure to exhaust administrative remedies attributable to lack of knowledge of the process was not a compelling circumstance justifying equitable relief. While there is no set rule or formula for identifying such compelling circumstances, "a lack of fault on the part of the claimant is a necessary prerequisite."

In Capruso v. Hartford Financial Services Group, Inc., *supra,* the Court declined to invoke its equity powers under authority provided in Zipes v. Trans World Airlines, 455 U.S. 385 (1982) because Capruso was an attorney and had received the assistance of an attorney in handling of her claims. The Court also noted that Capruso did not explain her failure to comply with the statutory requirements following a prior ruling, Kirkland v. Bianco, 595 F.Supp. 797, 799 (S.D.N.Y.1984), that "equitable modification is inappropriate where a plaintiff completely fails to file with the EEOC or allege with specificity in her complaint her reasons for the failure."

The District Court in Price v. Schwan's Home Services, Inc., *supra,* refusing to apply the equitable tolling language of Zipes, *supra,* held with respect to equitable tolling: ". . . Plaintiff is not entitled to the requested equitable tolling of the statute of limitations to allow him to refile with the PHRC and/or the EEOC. To be entitled to equitable tolling, the Plaintiff is required to show that '[he was] prevented from filing in a timely manner due to sufficiently inequitable circumstances.' ... Mere inadvertence of counsel is not enough. . . . For an attorney's mistake or misconduct to constitute grounds for equitable tolling, it must be shown that the attorney's mistake or misconduct was more than garden variety neglect.'"

Again, while these cases are not authority binding on this Court, they are instructive. Burdette offers no explanation for her failure to file the EEOC complaint. Her failure is the garden variety neglect mentioned in Price.

There is not one scintilla of evidence offered to suggest someone prevented or in any way caused Burdette and/or her counsel to not exhaust the administrative remedy that was available.

Burdette has not offered this Court a single authority supporting ignoring her failure to exhaust. Absent such authority, the undersigned is unwilling to dispense with the administrative process Congress established to quickly resolve claims of discrimination in employment without resort to the courts.

### IV.
### Decision and Order

For the reasons discussed, the Court **GRANTS** the Defendant's motions for summary judgment (DE 44-45 and 67-68) and **DISMISSES WITH PREJUDICE** all of the Burdette's federal and state claims as to Advanced Telemarketing Corporation, dba Aegis Communications Group.

On November 3, 2009 Plaintiff filed her Motion To Supplement  Plaintiff's Opposition To Motion For Summary Judgment Regarding Failure To Exhaust Administrative Remedies (DE 76). The Court considered the <u>Kerns v. Bucklew</u>, 178 W.Va. 68 1987 decision of the West Virginia Supreme Court of Appeals and accordingly **IN PART GRANTS** Plaintiff's Motion to File (DE 76) but finds the <u>Kerns v. Bucklew</u> decision not controlling and not relevant to the findings and conclusions herein made relative to the substantive issues of disability **AND ACCORDINGLY DENIES THE SUBSTANTIVE RELIEF REQUESTED IN THE MOTION**., and directs the Clerk to remove it from the docket of motions actively pending before the Court.

The Court has no need to address the following motions as the same have been rendered moot by  the Court's ruling on the motions for summary judgment.  Accordingly, the Clerk is directed to remove each of them from the docket of motions actively pending before the Court:

DE 58  Motion in Limine

DE 59 Motion in Limine

DE 60  Motion in Limine

DE 61 Motion in Limine

DE 62 Motion in Limine

DE 63 Motion in Limine

DE 65 Motion in Limine

DE 66 Motion in Limine.

The Court having denied Plaintiff all relief, the Clerk is hereby **DIRECTED TO ENTER JUDGMENT IN FAVOR OF THE DEFENDANT AGAINST THE PLAINTIFF.** (F.R.Civ.P. 58(b))

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Scheduling Order to counsel of record.

DATED: November 13, 2009

*John S. Kaull*
John S. Kaull
United States Magistrate Judge